**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE JIMENEZ MORENO and MARIA JOSE LOPEZ, | ) ) ) | |
| on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| *Plaintiffs*, | ) ) | No. 1:11-cv-05452 |
| vs. | ) ) | Judge John Z. Lee |
| JANET NAPOLITANO, et al., | ) ) ) | |
| in their official capacities, | ) ) ) | |
| *Defendants*. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

The discovery produced in this lawsuit confirms that Defendants are issuing immigration detainers without any showing of probable cause and risk of flight, and without prompt review by a neutral judicial officer.  As a result, their detainer program systematically violates class members' Fourth and Fifth Amendment rights, as well as the statutory limits on Defendants' warrantless civil arrest authority.  There is no genuine dispute of material fact for trial; Plaintiffs are entitled to summary judgment.

The violations at issue here stem from Defendants' issuance of immigration detainers to federal, state, and local law enforcement authorities ("LEAs") with respect to individuals in their custody.  For years, these detainers commanded the LEAs to "maintain custody" of such individuals for 48 hours after they should otherwise be released, on the ground that Defendants had "initiated" an "[i]nvestigation . . . to determine whether [the] person [was] subject to removal

from the United States." Obviously, the mere *initiation of an investigation* does not constitute probable cause to deprive a person of his liberty. Nor did Defendants provide any of the other procedural protections a person is entitled to receive incident to an arrest. Many, many of these detainers remain outstanding today, and Defendants have made no effort to rescind them—other than with respect to the named plaintiffs, in a failed attempt to moot this case.

During this litigation, Defendants have made a series of changes to their immigration detainer form, but none of those changes resolve the program's fundamental legal shortcomings. In 2012, Defendants revised the I-247 Form so that it purported to authorize the LEAs to detain an individual on the stated ground that ICE had "[d]etermined that there is reason to believe the individual is an alien subject to removal from the United States."[1] Yet having an ICE officer check a box stating that there is "reason to believe" or "probable cause" is still not sufficient to ensure compliance with Fourth Amendment protections. Then, in 2015, Defendants again revised the I-247 detainer form to include general information about possible investigative steps the ICE officer may have undertaken to reach the allegation of "probable cause." This too falls fatally short of an individual, particularized showing of probable cause. Further, while the form at the time this litigation was filed said nothing about notice to the detained individual, the revised forms still merely *request* that the LEA provide him with a copy. And *none* of the detainer forms and procedures call for prompt review by a detached, neutral judicial officer.

In other words, despite the purported changes made during this litigation, Defendants' policies and procedures for issuing detainers remain essentially the same. Defendants *still* routinely issue detainers without any practice or procedure in place:

---

[1] The Seventh Circuit has determined that the evidentiary standard "reason to believe" is the functional equivalent to "probable cause." *United States v. Cantu*, 519 F.2d 494 (7th Cir. 1975).

- ▪ to ensure that their officers make an individual, particularized showing of probable cause to conclude that a person is a non-citizen and removable before issuing a detainer against him;

- ▪ to subject an officer's allegation of probable cause to independent judicial review either prior to issuance of the detainer or within 48 hours of the confinement;

- ▪ to provide the detained individual with due process, including guaranteed notice of the detainer and a meaningful opportunity to be heard; and

- ▪ to ensure that officers make an individualized determination that the person is "likely to escape" before issuing a detainer without a warrant and then brought "without unnecessary delay" before an immigration judge, as the applicable statutes require.

There is no genuine dispute of material fact about what Defendants' practices and procedures do and do not provide. Defendants are continuing to issue immigration detainers without the barest of protections required by the Constitution and applicable statutes. This case has gone on long enough; the Court should enter summary judgment in Plaintiffs' favor and issue appropriate injunctive relief.

## II.    LEGAL STANDARD

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the movant "identif[ies] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact," the burden shifts to the non-moving party to "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The nonmovant must provide "evidence 'upon which a jury could properly proceed to find a verdict' in [the nonmovant's] favor." *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis original).

## III. ARGUMENT

This case is about Defendants' policies and procedures for issuing immigration detainers—none of which are in dispute. Although Defendants have made cosmetic changes to their detainer form during the course of this lawsuit (SOF ¶¶ 6-13), ICE's policies and procedures for issuing immigration detainers are substantively unchanged and continue to be applied uniformly. SOF ¶¶14-66. These policies and procedures violate class members' Fourth and Fifth Amendment rights, as well as the limits on Defendants' warrantless civil arrest authority, as contained in the federal immigration laws and implemented through the Administrative Procedure Act ("APA").

### A. The detainer program violates the probable cause requirements of the Fourth Amendment.

An ICE detainer asks a federal, state, or local LEA to hold a person for an additional 48 hours of imprisonment "beyond the time when the subject would have otherwise been released" from the LEA's custody. SOF ¶ 13. The 48-hour detention begins after the period of criminal custody ends—whether the individual has paid bail, been acquitted, received a dismissal of charges, or completed a prison sentence. *Id.*

Being incarcerated for an additional 48 hours based on a detainer is a new seizure to which the Fourth Amendment unquestionably applies. *See, e.g., Miranda-Olivares v. Clackamas County*, No. 12-cv-02317, 2014 WL 1414305, at * 9-10 (D. Or. Apr. 11, 2014) (the "continuation of [plaintiff's] detention based on the ICE detainer" constituted a "new arrest, and must be analyzed under the Fourth Amendment.") (awarding summary judgment to the

detainee). "Longstanding precedent establishes that '[t]he Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest.'" *Morales v. Chadbourne*, 793 F.3d 208, 215 (1st Cir. 2015) (quoting *United States v. Brignoni–Ponce,* 422 U.S. 873, 878 (1975) (citing *Davis v. Mississippi,* 394 U.S. 721 (1969) and *Terry v. Ohio,* 392 U.S. 1, 16-19 (1968); *see also Arizona v. United States*, -- U.S. --, 132 S. Ct. 2492, 2509 (2012) ("Detaining individuals solely to verify their immigration status would raise constitutional concerns."). By definition, but for Defendants' issuance of a detainer, the subject of the detainer would be released from custody. *See Miranda-Olivares*, 2014 WL 1414305, at * 9-10. The Fourth Amendment protects an individual from such a seizure by requiring that it be reasonable. *See Dunaway v. New York,* 442 U.S. 200, 216 (1979) ("[D]etention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest.").

The Supreme Court has long recognized the severity of the penalty of deportation; indeed, immigration enforcement has evolved over the past few decades such that it has become inextricably linked to the criminal justice system. *Padilla v. Kentucky*, 559 U.S 356, 366 (2010) (citing *Fong Yue Ting v. United States*, 149 U.S. 698, 740 (1893)). Both criminal and immigration-related arrests result in a seizure and create the prospect of serious repercussions for the arrestee. An immigration detainer announces to an LEA that DHS has determined that "probable cause exists that the *subject is a removable alien*." SOF ¶ 11 (emphasis added). Removal, more commonly known as deportation, "is a drastic measure and at times the equivalent of banishment [or] exile . . . ." *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948); *see also Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922) ("[Deportation] may result [ ] in loss of both property and life, or of all that makes life worth living."). For example, had they been

removable, named Plaintiffs Moreno and Lopez would have faced a minimum of 10 years of banishment from family in the United States before they could seek discretionary readmission to the United States. *See* 8 U.S.C. §§ 1182(a)(9)(A)(ii).

Recognizing the significant protected interests, courts from within this Circuit and beyond have held that immigration arrests must comply with Fourth Amendment protections. *See Arias v. Rogers*, 676 F.2d 1139, 1142-43 (7th Cir. 1982) (finding, pursuant to 8 U.S.C. § 1357(a)(2) and the Fourth Amendment, that subsequent to a warrantless immigration arrest, an arrestee must be brought without unnecessary delay before an immigration judge for a probable cause hearing); *Illinois Migrant Council v. Pilliod*, 531 F. Supp. 1011, 1020-24 (N.D. Ill. 1982) (holding that INS [now ICE] must comply with Fourth Amendment protections when exercising its civil arrest authority); *cf. Buquer v. City of Indianapolis*, 797 F. Supp. 2d 905, 918-919 (S.D. Ind. 2011) (granting preliminary injunction enjoining Indiana law to permit LEAs to arrest/detain based on issuance of an immigration detainer because the law did not ensure basic Fourth Amendment protections), *permanently enjoined*, *Buquer v. City of Indianapolis*, 2013 WL 1332158, at *10 (S.D. Ind. Mar. 28, 2013) (same legal conclusion); *see also Morales*, 793 F.3d at 215 ("It was [] clearly established well before [plaintiff] was detained in 2009 [on an immigration detainer] that immigration stops and arrests were subject to the same Fourth Amendment requirements that apply to other stops and arrests . . . ."); *Miranda-Olivares*, 2014 WL 1414305, at *10 (holding that "continued detention" of an individual pursuant to an ICE detainer "exceeded the scope of the Jail's lawful authority over the released detainee, constituted a new arrest, and must be analyzed under the Fourth Amendment")=; *Uroza v. Salt Lake Cnty.*, No. 11-cv-713, 2013 WL 653968, at *6 (D. Utah Feb. 21, 2013) ("The proposition that immigration enforcement agents need probable cause to arrest pursuant to 8 U.S.C. § 1357(a)(2)

6

and in accordance with the Fourth Amendment has been established in the Tenth Circuit since 1969.").

The undisputed facts establish that ICE's detainer program violates the Fourth Amendment by ignoring two of its most basic requirements: (1) a seizure must be supported by an individual, particularized showing of probable cause; and (2) the showing of probable cause must be reviewed promptly by a detached, neutral judicial officer. Each violation justifies an award of summary judgment.

> **1.    Defendants issue detainers without any policy or practice of supporting the arrest with a sworn individual and particularized showing of probable cause.**

"The general requirement for a reasonable seizure is probable cause." *Illinois Migrant Council*, 531 F. Supp. at 1016.   Probable cause requires a showing that "'the facts and circumstances within [ ] (the officers') knowledge and of which they ha[ve] reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)).   Probable cause to justify seizing a person must be based on "specific, articulable facts."  *Illinois Migrant Council*, 531 F. Supp. at 1024.   Those facts must be "particularized with respect to that person." *United States v. Johnson*, 170 F.3d 708, 715 (7th Cir. 1999) (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)).

In the context of an arrest warrant, the particularized showing of probable cause must be made by "oath or affirmation," either orally or in the form of an affidavit before a detached, neutral magistrate.  *See* U.S. CONST. amend. IV (". . . no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."); *Gerstein v. Pugh*, 420 U.S. 103, 116 n. 18, 117 (1975);

7

*Illinois Migrant Council*, 531 F. Supp. at 1022 ("An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense.").

As the summary judgment record shows, Defendants do not require—and ICE agents do not have a practice of making—any sworn, individual, and particularized showing of probable cause before issuing an immigration detainer. SOF ¶¶ 16-17. Indeed, ICE concedes that it does not require its officers to make a basic record explaining why they have issued a detainer. SOF ¶ 16, at Ex. F, K. Kauffman Dep. 50:4-20. Further, given that Defendants never bring class members before a detached, neutral judicial officer for a probable cause hearing after arrest on a detainer (*see infra* Section III.A.2.), the ICE agent is never required to articulate an individual, particularized showing of probable cause at all. SOF ¶¶ 16-19. Although ICE's new 2015 detainer forms now include general information about possible investigative steps ICE may have undertaken to reach its allegation of "probable cause," the new forms still fall fatally short of requiring an individual, particularized showing. SOF ¶ 12. And there is certainly no requirement that the showing be supported by "oath or affirmation."

Indeed, ICE does not have policies and practices in place that would even make it *possible* for an officer to establish probable cause. To satisfy the probable cause requirement, the officer issuing the detainer would need to have probable cause "to believe that the subject of the detainer is (1) an alien who (2) may not have been lawfully admitted to the United States or (3) otherwise is not lawfully present in the United States." *Galarza v. Szalczyk,* No. 10-cv-06815, 2012 WL 1080020, at *13 (E.D. Pa. Mar. 30, 2012), *rev'd in part on other grounds*, 745 F.3d 634 (3d Cir. 2013); 8 U.S.C. § 1357(a)(2); *see* SOF ¶¶ 22-24. Thus, "probable cause" in this context means probable cause to believe that an individual is a noncitizen without legal

status or with a criminal conviction that would make him or her removable from the United

States.  SOF ¶¶ 23-24. Probable cause in this context implicates a discrete number of

investigatory inquiries.  SOF ¶ 26.  The officer first would need to assess whether the subject is a

citizen, either through birthright, parentage, or naturalization.  *See* SOF ¶¶ 26-28, 30-33, 36-46.

If there is probable cause to believe the individual is a non-citizen, the officer then would need to

determine whether the person is a Lawful Permanent Resident ("LPR") or in another lawful

status.  SOF ¶¶ 26, 35.  If the person is an LPR or otherwise in a lawful status, the officer would

need to determine whether the individual has been convicted of an offense that falls within

statutorily enumerated categories of criminal offenses.  *See* 8 U.S.C. §§ 1182, 1227; SOF ¶¶ 26,

29.  Without some inquiry on each point, the agent *could not possibly* have "probable cause."

As the summary judgment record shows, ICE's policies and procedures do not require

that any of these steps be taken.  Before December 2012, Defendants issued detainers against

class members based merely on an officer's "initiat[ion]" of an "investigation" into a class

member's removability from the United States.  *See* SOF ¶ 11. This practice circumvented the

requirement of probable cause and since has been denounced as unconstitutional.  *See, e.g.,*

*Morales v. Chadbourne*, 996 F. Supp. 2d 19, 29 (D.R.I. 2014) *aff'd in part, dismissed in part,*

793 F.3d 208 (1st Cir. 2015) ("One needs to look no further than the detainer itself to determine

that there was no probable cause to support its issuance. The detainer specifically stated that Ms.

Morales should be held solely because an investigation of her status in the United States had

been initiated. The fact that an investigation had been initiated is not enough to establish

probable cause because the Fourth Amendment does not permit seizures for mere

investigations."); *Miranda-Olivares*, 2014 WL 1414305, at *11 (same).  Thousands of these

blatantly unlawful detainers were issued over the years, and Defendants have made no attempt to

rescind them or to instruct LEAs not to use them as a basis for continuing any individual's detention. SOF ¶ 7.

As revised in December 2012, Defendants' detainer form purported to authorize detention on the ground that ICE has "[d]etermined that there is reason to believe the individual is an alien subject to removal from the United States." SOF ¶ 11. But while the language may have changed, Defendants' document production and 30(b)(6) testimony confirm that the process for issuing detainers did not. ICE still did not have any policy or procedure for how to establish probable cause. SOF ¶¶ 14-15, 25-30, 42-46; Ex. E, K. Kauffman Dep. 73:20-74:4 (testifying that there was no change in policy or procedure regarding investigation and issuance of detainers in December 2012). Indeed, ICE concedes that it routinely issued immigration detainers against individuals who turned out to be non-removable LPRs. SOF ¶ 34. For example, while ICE concedes that criminal grounds of removability are complex, ICE does not require its officers to obtain confirmation of any criminal conviction that would make the individual removable. SOF ¶ 29. As with earlier versions of their detainer form, Defendants have made no attempt to rescind December 2012 detainers or to instruct LEAs not to use them as a basis for continuing any individual's detention. SOF ¶ 7.

Defendants made yet more revisions to the detainer form in 2015—creating a new I-247D Form (for high priority individuals) and the I-247X Form (for low priority individuals). SOF ¶¶ 7-9; Ex. J at DHS0002665-67 (training materials describing the 2015 changes to the detainer process as involving only enforcement priorities). Both 2015 detainer forms include the words "probable cause" and provide general information about possible investigative steps ICE may have taken to reach its allegation of "probable cause." SOF ¶ 12.

Yet, shockingly, ICE's new 2015 detainer training materials instruct ICE agents that immigration detainers do not result in any "arrest" at all, thus suggesting that there would not be any reason to comply with the Fourth Amendment in the first place. SOF ¶ 20 (explaining that this instruction contradicts prior positions by the agency). Not surprisingly, Defendants' 2015 internal detainer policy and training materials provide ICE agents with no further guidance on the investigation required before issuing a detainer. SOF ¶ 21. Defendants continue to operate without any policies, procedures, checklists, or the like that might ensure that ICE agents establish probable cause before issuing a detainer. SOF ¶¶ 14-15, 21, 25-29, 42-46; *see Uroza*, 2014 WL 4457300, at * 8 (holding plaintiff's constitutional challenge to his immigration detainer not moot, stating that "even if language of the current detainer demonstrates probable cause, Uroza alleges that ICE's practice of issuing the Form I–247 without first conducting an investigation as to immigration status and flight risk has not changed. Uroza alleges that federal agents still do not undertake a factual investigation sufficient to provide probable cause as to immigration status before issuing the form.").

The deficiencies in these policies are so extreme that there is little to prevent detainers from being issued against those who have acquired or derived U.S. citizenship—like Plaintiff Moreno in this case. Although ICE concedes that certain evidence would be a "red flag" or "Indicia of Potential U.S. Citizenship" that would require a further investigation, the current detainer process is so deficient *that it would not alert ICE agents to the existence of such red flags in the first place.* SOF ¶¶ 36-41. ICE continues to rely heavily on fingerprint identification and a search of the targeted individual in four DHS databases (CIS, CLAIMS, TECS, ENFORCE) to determine whether to issue an immigration detainer. SOF ¶¶ 14-15, 40-46. But these DHS databases do not contain most of the information that ICE concedes would be a "red

flag" or "Indicia of Potential U.S. Citizenship" and would trigger a further investigation. SOF ¶¶ 37, 40-46. In many instances, a simple interview is all that would be required, and yet the ICE agent is not required to conduct one; ICE agents generally do not conduct interviews of subjects before issuing detainers, and yet they issue them nonetheless. SOF ¶¶ 43-44. ICE agents also rarely review an individual or his parents' immigration files (aka "Alien file" or "A-file") before issuing a detainer. SOF ¶ 45. In short, there may be "red flags" galore, but the agent would never know it, because he is looking in the wrong direction.

Accordingly, despite the changes to the face of the detainer forms, Defendants *still* have no policy or procedure in place to ensure that every detainer is, in fact, supported by probable cause. Nor is the officer's probable cause determination ever "supported by oath or affirmation" in the form of an individual, particularized showing, as the Fourth Amendment requires. Either of these defects is sufficient on its own to warrant summary judgment in Plaintiffs' favor.

### 2. Defendants issue detainers without any determination or review by a detached, neutral judicial officer.

Under the Fourth Amendment, mere allegations of probable cause are not enough; there must be a "*judicial determination* of probable cause." *Gerstein*, 420 U.S. at 114, 125 (emphasis added). "The judicial determination of probable cause may be made before the arrest (in the form of an arrest warrant) or promptly after the arrest, at a probable cause hearing (sometimes called a *Gerstein* hearing)." *Lopez v. City of Chicago*, 464 F.3d 711, 718 (7th Cir. 2006). "But whether the arresting officer opts to obtain a warrant in advance or present a person arrested without a warrant for a prompt after-the-fact *Gerstein* hearing, the Fourth Amendment requires a *judicial* determination of probable cause." *Id.* (emphasis in original).

To be considered "prompt," a post-arrest judicial determination of probable cause must take place within 48 hours of the arrest. *See County of Riverside v. McLaughlin*, 500 U.S. 44

(1991) (holding that "[w]here an arrested individual does not receive a probable cause determination within 48 hours," the government bears the burden of "demonstrat[ing] the existence of a bona fide emergency or other extraordinary circumstance," and rejecting a county policy of conducting probable cause hearings "within two days, exclusive of Saturdays, Sundays, or holidays" as unconstitutional). Even within the 48-hour period, a probable cause determination "may nonetheless violate *Gerstein* if the arrested individual can prove that his or her probable cause determination was delayed unreasonably," such as "for the purpose of gathering additional evidence to justify the arrest . . . ." *Id.* at 56-57; *see Willis v. City of Chicago*, 999 F.2d 284 (7th Cir. 1993) (holding that policy of holding plaintiff for 45 hours without judicial determination of probable cause while investigating other potential crimes violated the Fourth Amendment).

This guarantee of a judicial determination of probable cause extends to "*any* significant pretrial restraint of liberty," *Gerstein*, 420 U.S. at 125 (emphasis added), and the federal government has conceded that it encompasses immigration arrests. *See* INS, Final Rule-Making, "Enhancing the Enforcement Authority of Immigration Officers," 59 FR 42406-01, 42411 (1994) (discussing final regulations regarding immigration officers' authority to make administrative warrantless arrests under 8 U.S.C. § 1357(a)(2)) ("The commenters suggested that the regulations be amended to incorporate the judicial construction of 'reason to believe,' and to require compliance with outstanding court orders regarding arrest and post-arrest procedures. As stated previously, judicial precedent and other policy standards are subject to revision and are not appropriate to codify. The Service is clearly bound by such interpretations, including those set forth in *Gerstein v. Pugh*, 420 U.S. 103 (1975)."); *see also Arias*, 676 F.2d at 1142 (explaining that the Fourth Amendment requires and "the immigration laws, specifically 8 U.S.C.

§ 1357(a)(2) . . . require[] that an alien arrested without a warrant 'be taken without unnecessary delay before an'" immigration judge, who functions as the equivalent to a "committing magistrate in a criminal proceeding"); *cf. Buquer*, 797 F. Supp. 2d at 918-19 (S.D. Ind. 2011) (preliminary injunction), *affirmed in Buquer*, 2013 WL 1332158, at *10 (permanently enjoining Indiana state law that sought to permit LEAs to arrest/detain based on issuance of an immigration detainer, holding that it violates the Fourth Amendment because, among other reasons, "[t]here is no mention of any requirement that the arrested person be brought forthwith before a judge for consideration of detention or release.").

Defendants' detainer program ignores this requirement in two ways. First, the I-247 detainer form purports to authorize detention of an individual for 48 hours without any hearing at all. This authorization plainly violates the requirement that a hearing be promptly held. *See County of Riverside*, 500 U.S. at 57-58; *Villars v. Kubiatowski*, 45 F. Supp. 3d 791, 801 (N.D. Ill. 2014) (Dow, J.) ("The forty-eight hour framework set forth in *County of Riverside* 'governs the length of time which may elapse before a probable cause hearing' in cases involving extended detention.") (quoting *Chortek v. City of Milwaukee*, 356 F.3d 740, 746 (7th Cir. 2004)). Indeed, Defendants' program violates *County of Riverside* because it does not provide *any* hearing, much less a prompt one, in which a detainee could contest the detention.

Second, Defendants' program also violates the judicial authorization requirement by permitting ICE's own enforcement agents to issue detainers without any independent judicial review. *See* 8 C.F.R. § 287.7(b); *see also* SOF ¶¶ 14-15, 18-19, 70-71, 78-80. The governing regulation expressly allows individual deportation officers and immigration enforcement agents to issue detainers "at any time" on their own initiative. 8 C.F.R. § 287.7(a). And once a detainer is issued, there is no judicial assessment at all. SOF ¶¶ 18-19.

14

Defendants' blanket conferment of the authority to determine probable cause onto their enforcement agents is plainly unconstitutional. The Fourth Amendment requires "a detached and neutral magistrate" to review either (a) probable cause for a warrant pre-arrest, or (b) probable cause for a warrantless arrest after the fact. *Gerstein*, 420 U.S. at 114, 125; *Shadwick v. City of Tampa*, 407 U.S. 345, 350 (1972) (explaining that the term "magistrate" is flexible so long as the judicial officer is "neutral and detached" from the activities of law enforcement); *Arias,* 676 F.2d at 1142 (indicating that review by an immigration judge would satisfy the Fourth Amendment requirement of a detached and neutral magistrate). As the Supreme Court has explained, review by a "detached and neutral magistrate" is necessary because only such an individual possesses the necessary "independent judgment" to assess probable cause. *Whiteley v. Warden, Wyo State Penitentiary*, 401 U.S. 560, 564 (1971); *see also Shadwick*, 407 U.S. at 348 (1972) ("[S]omeone independent of the police and prosecution must determine probable cause.").

In short, Defendants have put the fox in charge of the henhouse. They have vested the same people who are charged with (and evaluated based upon) their enforcement of the nation's immigration laws with unchecked authority to have individuals arrested. This arrangement is particularly alarming given the more than 17 million foreign-born U.S. citizens (millions automatically through a parent), 13 million LPRs, and 61 million other individuals in a lawful status who are currently living in the United States. SOF ¶¶ 30-35. Defendants can no more disregard the judicial authorization requirement than they can cast aside any other protection under the Fourth Amendment. This violation is also sufficient to justify an award of summary judgment in favor of Plaintiffs on their Fourth Amendment claim.

**B.      The detainer program violates the procedural rights guaranteed by the Fifth Amendment.**

Defendants' detainer program does not provide the kinds of procedural protections that the Fifth Amendment requires. "A procedural due process claim requires a two-fold analysis. First, [the court] must determine whether the plaintiff was deprived of a protected interest; second, [the court] must determine what process is due." *Pugel v. Bd. of Trustees of Univ. of Illinois*, 378 F.3d 659, 662-63 (7th Cir. 2004). "To evaluate the adequacy of procedural protections in a particular situation," courts consider "'[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest.'" *Pugel*, 378 F.3d at 663 (quoting *Gilbert v. Homar*, 520 U.S. 924, 931-32 (1997), quoting *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976)).

The first part of the due process inquiry is easily satisfied here. Again, "but for" the issuance of a detainer, the individual would be free to go. *See Miranda-Olivares*, 2014 WL 1414305, at *9-10. ICE's detainers thus deprive class members of a significant protected interest—their liberty—by causing their continued confinement. *See* U.S. CONST., amend. V (guaranteeing that no person shall "be deprived of life, liberty, or property, without due process of law"). The next question, then, is "what process is due?" Under the factors described in *Pugel* and *Matthews*, far more is "due" than what the detainer program provides.

*First*, the private interest that ICE detainers affect is unquestionably significant: detainers result in actual imprisonment. This deprivation is more than sufficient to trigger a right to due process. *See Ortega v. U.S. Immigration & Customs Enforcement*, 737 F.3d 435, 439 (6th Cir. 2013) *cert. denied sub nom. Ortega v. Immigration & Customs Enforcement*, 135 S. Ct. 48 (2014) ("prison confinement" due to an ICE detainer "suffice[s] to trigger due process.")

***Second***, the risk of an "erroneous deprivation" is high. Under the form that was in place when Plaintiffs brought suit in August 2011 (and until December 2012), Defendants issued detainers solely on the basis of their *initiation of an investigation* "to determine whether [the person in LEA custody] is subject to removal from the United States." *See* SOF ¶¶ 7, 11. Given the lack of any mechanism for determining probable cause (SOF ¶¶ 14-21, 25-30, 36-46), there was and continues to be a significant risk that an individual who is not deportable will be confined for 48 hours based on on such a detainer. *See* SOF ¶ 30-35. Indeed, the named plaintiffs in this case are, respectively, *a U.S. citizen and a non-removable LPR*. SOF ¶¶ 1-2, 67-80. And this is not uncommon; the record shows that *at least* hundreds of detainers have been erroneously issued to people like the named plaintiffs. SOF ¶ 34. The absence of any discernible process to challenge the detainers issued against Plaintiffs meant that they had no opportunity to demonstrate Defendants' error—other than filing this lawsuit, which finally got Defendants' attention and forced them to correct it. SOF ¶¶ 55, 72, 80.

Since then, little has changed. The detainer forms that ICE adopted in December 2011 and December 2012 merely "*request[s]* that the LEA provide a copy of the detainer form to the detained individual." Mem. Op. & Order at 3, ECF No. 146 (emphasis added); SOF ¶ 56. "ICE also added a section entitled 'Notice to the Detainee' and included a telephone number by which the individual could contact ICE if he or she believed the detainer to be improper." Mem. Op. & Order at 3, ECF No. 146; SOF ¶ 59. Yet when this Court granted class certification, it correctly recognized that none of the foregoing modifications to the detainer form appeared to be "sufficient to satisfy due process requirements." Mem. Op. & Order at 20, ECF No. 146. As the Court explained:

> there is evidence that Defendants had no authority to require cooperating LEAs to
> provide individuals with a copy of the detainers and did not keep track of whether

LEAs complied with that request.  Similarly, the mere fact that the detainer form listed a telephone number does not prove what if anything was done when the individuals called it.

*Id.* at 20 n. 13 (record citation omitted); *see* SOF ¶¶ 56-66.

This initial assessment was absolutely correct.  Even today, Defendants still do not *require* LEAs to serve a copy of the detainer on the affected individual. Defendants have confirmed as much in discovery. SOF ¶¶  56-57.  In fact, Defendants have no records to verify whether any cooperating LEA has *ever* provided a copy of the detainer form to a detained individual.  SOF ¶¶ 56, 58.   Absent a procedure to ensure that the detainee has indeed received notice, Defendants' mere *request* that an LEA effect service is insufficient.  *See Gates v. City of Chicago*, 623 F.3d 389, 401 (7th Cir. 2010) ("Due process requires, at a minimum, that" notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.") (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950)).

Similarly, Defendants' creation of a telephone number for claims of U.S. citizenship does not satisfy the Fifth Amendment's requirement of a due process hearing. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("[T]he root requirement of the Due Process Clause [is] ... that an individual be given an opportunity for a hearing before he is deprived of any significant [liberty] interest.").   A meaningful hearing is necessarily a proceeding before a neutral, detached magistrate who can determine whether the detainer was supported by probable cause and is free from error.  *See Shadwick*, 407 U.S. at 349-50.  Speaking with a telephone operator—who plainly is not neutral and detached from immigration enforcement activities, lacks the authority to make a decision, lift the detainer, or order the person's release from custody—is not meaningful relief.  SOF ¶¶ 62-64.  And Defendants' decision to shortcut a

proper hearing by providing a telephone number for claims of U.S. citizenship is flawed from a logistical standpoint as well. It incorrectly assumes that the only challenges to detainers involve claims of U.S. citizenship, that the individuals have all been informed of the telephone number, and they all have the ability to make telephone calls while otherwise in LEA custody. SOF ¶¶ 60-61. And, incredibly, DHS has no policy of notifying individuals of the result of its inquiries into their claims of U.S. citizenship. SOF ¶ 65.

Although Defendants have more recently taken further steps to change their procedures, this change still does not go nearly far enough. Under the 2015 detainer forms, ICE informs the LEAs that the detainer shall "take[] effect only if [the LEA] serve[s] a copy of th[e] form on the subject." SOF ¶ 57. The forms include a section in which an LEA can document how this service was effectuated. *Id.*, at Exs. D and HH. Yet Defendants still do not *require* service of every detainer issued, nor do they assess or even track the LEAs' compliance with these aspects of the form. SOF ¶¶ 56-58. There is simply no consequence if an LEA detains a class member on a detainer without serving the class member with a copy. SOF ¶ 58. Having enlisted the LEAs as part of their enforcement regime, Defendants cannot simply leave it to the LEAs to ensure that Defendants' program complies with the Fifth Amendment. And, of course, the new form provides no protection at all for the many class members against whom Defendants issued detainers *before* June 2015 (but who have not yet reached the end of their state or local incarceration). Again, for those individuals, Defendants have done nothing whatsoever to ensure notice and an opportunity to be heard.

***Finally***, turning to the final factor in *Pugel* and *Matthews*, Defendants' governmental interest in this context is overshadowed by the class members' interest in receiving adequate procedural protections incident to their detention. To be sure, Plaintiffs recognize that

19

Defendants have an interest in upholding the nation's immigration laws. But Defendants can still secure that interest while affording notice and an adequate and prompt hearing. The current detainer system may well be more administratively convenient for Defendants, but so would any system that simply disregarded the need for notice and the opportunity to be heard. These are critical constitutional protections, and they cannot be cast aside merely for administrative convenience. *See Pugel*, 378 F.3d at 662 ("The hallmarks of procedural due process are notice and an opportunity to be heard."); *Sonnleitner v. York*, 304 F.3d 704, 715 (7th Cir. 2002) ("There can be no due process without the opportunity to be heard at a meaningful time and in a meaningful manner.") (quotation marks and citation omitted). Plaintiffs are thus entitled to summary judgment on this claim as well.

**C.      The detainer program also exceeds the statutory limits placed on Defendants' warrantless arrest authority.**

The detainer program is also unlawful because it exceeds the power that Defendants have been given by Congress. The Immigration and Nationality Act ("INA") carefully circumscribes Defendants' authority to make warrantless arrests. Under 8 U.S.C. § 1357(a)(2), "[a]ny officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

> to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation *and is likely to escape before a warrant can be obtained for his arrest.*"

(Emphasis added). Even then, however, the arrested person "shall be taken without unnecessary delay" for an examination "before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States." *Id.* The detainer program exceeds these statutory limitations in several respects—and thus Plaintiffs are entitled to relief, as recognized by the provisions of the Administrative Procedure Act ("APA").

20

**First,** Defendants' violations of the Fourth Amendment also support a statutory claim because § 1357 incorporates the same requirements. Under the INA, Defendants cannot issue a detainer without a warrant unless they have "reason to believe" that the subject of the detainer is a non-citizen and is "in violation of" a law or regulation "made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens . . . ." *Id.* "Courts have consistently held that the 'reason to believe' phrase in § 1357 must be read in light of constitutional standards, so that 'reason to believe' must be considered the equivalent of probable cause." *Morales*, 793 F.3d at 216 (citing *Cantu,* 519 F.2d at 496 ("The words [in § 1357] of the statute 'reason to believe' are properly taken to signify probable cause."). For the reasons set forth in Section II.A. above, Defendants' policies and procedures for issuing detainers are ultra vires because they fail to comply with the Fourth Amendment's probable cause and judicial authorization requirements.

**Second,** the detainer program systematically ignores the flight risk requirement under § 1357(a)(2). To make a warrantless arrest, Defendants must have probable cause to believe not only that an individual is a removable non-citizen, but also that the individual "is likely to escape before a warrant can be obtained for his arrest . . . ." 8 U.S.C. § 1357(a)(2). Courts at all levels of our federal system have recognized this requirement. *See Arizona*, 132 S.Ct. at 2505-07 (holding that an Arizona statute was preempted because it purported to give Arizona law enforcement unlimited warrantless arrest authority, emphasizing that ICE's warrantless arrest authority is limited to situations when there is a likelihood of escape before a warrant can be obtained)*; Cantu,* 519 F.2d at 496-97 (holding that the statutory requirement of likelihood of escape in 8 U.S.C. § 1357 "is always seriously applied"); *Morales*, 793 F.3d at 216 (quoting § 1357(a)(2)) ("Without a warrant, immigration officers are authorized to arrest an alien only if

they have "*reason to believe that the alien so arrested* is in the United States in violation of any [immigration] law or regulation and *is likely to escape before a warrant can be obtained for his arrest*."); *Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995) (holding that this statute requires an individualized determination of flight risk); *U.S. v. Harrison*, 168 F.3d 483, 1999 WL 26921, at *4 (4th Cir. 1999) (unpublished) (explaining that "the critical question remains did the INS believe Harrison was likely to flee before a warrant could be obtained. In making such a determination, a court examines the objective facts within the knowledge of the INS Agents"; rejecting Government's position "that in every case in which an alien is deportable an arrest can be made without a warrant"); *Westover v. Reno*, 202 F.3d 475, 479-80 (1st Cir. 2000) (commenting that an immigration arrest was "in direct violation" of § 1357(a)(2) because "[w]hile INS agents may have had probable cause to arrest Westover by the time they took her into custody, there is no evidence that Westover was likely to escape before a warrant could be obtained for her arrest"); *U.S. v. Meza-Campos*, 500 F.2d 33 (9th Cir. 1975) (applying an individualized likelihood-of-escape analysis); *Contreras v. U.S.*, 672 F.2d 307 (2d Cir. 1982) (same); *Araujo v. United States*, 301 F. Supp. 2d 1095, 1101-02 (N.D. Cal. 2004) (holding that an INS arrest at the individual's home was not legally privileged because there was no likelihood of escape to support warrantless arrest under § 1357).

It is undisputed that Defendants' detainer program shirks § 1357(a)(2)'s flight risk requirement. Nowhere in Defendants' policies or procedures do they direct their officers to make an individualized determination of a person's likelihood of escape before issuing a detainer. *See* SOF ¶¶ 47-48. Indeed, the legacy INS policy manual acknowledges that a person is necessarily *unlikely* to escape while in custody, so immigration officers should obtain warrants before issuing detainers. *See* SOF ¶ 49, Ex. Q at DHS000098 ("A detainer placed under this

subsection [8 C.F.R. § 287.7(d)—detainer that requests detention] is an arrest which must be supported by probable cause. These detainers should be followed by [a Notice to Appear charging document]. Since it is *difficult to establish that these aliens* [in federal, state or local custody] *are likely to abscond before a warrant can be obtained to support an arrest without warrant under section 287(a)(2) of the Act* [§ 1357(a)(2)], a warrant of arrest should be issued and served upon the alien.") (emphasis added). The policy manual even provides guidance on the types of factors that might show likelihood of escape. *See* Ex. Q at DHS000083 ("Likelihood of escape before a warrant can be obtained may be shown by evidence of previous escape or evasions of immigration authorities, as well as lack of ties to the community such as family, home, or a job. Attempted flight from an INS officer or nervous behavior suggesting that the suspect is looking for an opportunity to abscond may justify an arrest without a warrant. The mobility of the suspect may justify a belief that the suspect is likely to escape before a warrant can be obtained."); *Pearl Meadows Mushroom Farms, Inc. v. Nelson*, 723 F. Supp. 432, 449-50 (N.D. Cal. 1989) (holding that INS agents did not meet these criteria and violated the limits of their warrantless arrest authority under § 1357(a)(2)).

Defendants now prefer to issue detainers regardless of an individual's flight risk, and the reason for this policy change is manifest: If Defendants complied with the INA and were required to make individualized determinations of flight risk, they would no longer be able to issue warrantless detainers against individuals who are already in custody, as those individuals by definition *cannot* be considered likely to escape. *See Morales*, 793 F.3d at 218 ("[W]e do not understand why it would be more difficult to obtain the facts necessary to establish probable cause for an individual who was detained in criminal custody than for an individual who was walking freely in the community. Arguably, it would be easier to establish probable cause in the

case of detainers, because immigration officers would have easier access to interview and obtain records from an individual detained in criminal custody.").

  ***Finally,*** Defendants have exceeded their statutory authority under the INA by creating a regime for detainers that does not require that the individual be brought "without unnecessary delay" before an immigration judge. *See Arias*, 676 F.2d at 1142 ("8 U.S.C. § 1357(a)(2) . . . requires that an alien arrested without a warrant 'be taken without unnecessary delay before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States.' The reference is to a special inquiry officer, also called an immigration judge. Special inquiry officers have judicial authority, and therefore correspond to the committing magistrate in a criminal proceeding.") (citations omitted). As the Seventh Circuit correctly observed in *Arias*, when § 1357(a)(2) was passed into law in 1952, the immigration adjudicators, known at the time as "special inquiry officers" (now immigration judges) were part of INS (aka "the Service") and were the "officers . . . having the authority to examine aliens as to their right to enter or remain in the United States." 8 U.S.C. § 1357(a)(2); Pub. L. No. 82-414, 66 Stat. 163 (enacted June 27, 1952) (stating in INA § 236(a) (exclusion proceedings) that "[a] special inquiry officer shall conduct proceedings under this section . . . . [and] [h]e shall have the authority in any case to determine whether an arriving alien who has been detained . . . shall be allowed to enter or shall be excluded and deported" and in INA § 242(b) that "[a] special inquiry officer shall conduct proceedings under this section to determine the deportability of any alien . . . and shall make determinations, including orders of deportation."); DOJ, "Evolution of the U.S. Immigration Court System: Pre-1983" (updated April 30, 2015), *available at* http://www.justice.gov/eoir/evolution-pre-1983 (last visited Dec. 9, 2015) (showing in 1973 "special inquiry officers" were authorized to use the title "immigration judge" and in 1983 the

24

immigration court and its judges were separated from INS or "the Service" and placed in the newly established Executive Office of Immigration Review).Accordingly, as the Court observed in *Arias*, 8 U.S.C. § 1357(a)(2) clearly contemplates a prompt hearing *before an immigration judge* for anyone who has been subject to a warrantless arrest.

At a minimum, in light of class members' Fourth Amendment rights, constitutional avoidance principles require interpreting § 1357(a)(2) to say that the prompt hearing before "an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States" be before *an immigration judge* or another detached, neutral judicial officer. *See Arias*, 676 F.2d at 1142 (explaining that the Fourth Amendment would require that the hearing contemplated in § 1357(a)(2) be before an immigration judge).

In sum, Defendants' detainer program exceeds their statutory warrantless arrest authority in several respects. It does not assure the presence of probable cause, it does not comply with the requirement that the subject of the detainer "shall be taken without unnecessary delay" before an immigration judge, and it does not entail any examination of flight risk. For all these reasons, Plaintiffs are entitled to summary judgment based upon their statutory claim as well.

## IV.  CONCLUSION

This case has gone on long enough. Although Defendants have made various changes to their detainer program through the years, they have done nothing to address the fundamental legal flaws on which Plaintiffs' claims rest. Nor have they made any effort to rescind or cancel the many detainers that were issued under the older versions of their detainer form. Plaintiffs respectfully request that the Court award summary judgment against Defendants on all of the claims in this case and enter appropriate injunctive and declaratory relief, along with an award of attorney's fees and costs.

Dated:  December 11, 2015

Respectfully submitted,

**By:**  ___/s/   Linda T. Coberly_____

Mark Fleming
Charles Roth
Claudia Beatrice Valenzuela Rivas
NATIONAL IMMIGRANT JUSTICE CENTER
208 South LaSalle Street, Suite 1300
Chicago, Illinois 60604
Telephone: (312) 660-1370
Facsimile: (312) 660-1505
mfleming@heartlandalliance.org
croth@heartlandalliance.org
cvalenzuela@heartlandalliance.org

Linda T. Coberly
Joanna Travalini
Lee B. Muench
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile:  (312) 558-5700
lcoberly@winston.com
jtravalini@winston.com
lmuench@winston.com

*Attorneys for Plaintiffs*